J-A28013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.S.D., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | No. 1117 EDA 2017 |

Appeal from the Order Entered March 2, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000573-2016

BEFORE: GANTMAN, P.J., PANELLA, J., and DUBOW, J.

MEMORANDUM BY GANTMAN, P.J.: **FILED DECEMBER 04, 2017**

Appellant, T.D. ("Mother"), appeals from the order entered in the Philadelphia County Court of Common Pleas Family Court Division, which granted the petition of the Department of Human Services ("DHS") for involuntary termination of Mother's parental rights to her minor Child, M.S.D. ("Child"). We affirm.

In its opinion, the Family Court fully and correctly set forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them.

Mother raises three issues for our review.

> THE TRIAL COURT ERRED IN TERMINATING [MOTHER'S] PARENTAL RIGHTS UNDER 23 PA.C.S.A. SECTION 2511(A)(1), 2511(A)(2), 2511(A)(5), AND 2511(A)(8)?
>
> THE TRIAL COURT ERRED IN FINDING THAT TERMINATION OF THE PARENTAL RIGHTS OF MOTHER BEST SERVED THE CHILD'S DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS UNDER 23 PA.C.S.A. SECTION 2511(B)?

THE TRIAL COURT ERRED IN GRANTING THE GOAL CHANGE TO ADOPTION?

(Mother's Brief at 5).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing

> as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

DHS filed a petition for the involuntary termination of Mother's parental rights to Children on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the

parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b)

provisions." *In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of …her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

> Termination under Section 2511(a)(1) involves the following:

>> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

>>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

>> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for …her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination

petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of …her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D., supra* at 337. "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d

327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super. 2003);

*In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have …her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and

- 8 -

support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert [himself] to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his… ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of …her child is converted, upon the failure to fulfill …her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.,* 909 A.2d 818, 822 (Pa.Super. 2006).

In order to conclude that the trial court abused its discretion, we must determine that the court's

judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822-23 (internal citations omitted).

The Juvenile Act controls the disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

**§ 6351. Disposition of dependent child**

\* \* \*

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5)    The likely date by which the placement goal for the child might be achieved.

(5.1)  Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)    Whether the child is safe.

*    *    *

(9)    If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i)  the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

*    *    *

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all

relevant evidence presented at the hearing, the court shall determine one of the following:

(1)   If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)   If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)   If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)   If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

*   *   *

**(f.2) Evidence.**—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

> **(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g).

"When the child welfare agency has made reasonable efforts to return a [dependent] child to [the child's] biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C., supra* at 823 (citing *In re G.P.-R.*, 851 A.2d 967, 973 (Pa.Super. 2004)).

> Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under Section 6351. *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); *In re S.B.*, 943 A.2d 973, 978 (Pa.Super. 2008), *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008). "[T]he parent's rights are secondary" in a goal change proceeding. *In re D.P., supra*.
>
> Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C., supra* at 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002). *See also In re S.B., supra* at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); *In re A.P.*, 728 A.2d

375, 379 (Pa.Super. 1999), *appeal denied*, 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa.Super. 2006).

***In re R.M.G.***, 997 A.2d 339, 347 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 372 (2010) (some internal citations and quotation marks omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the comprehensive and well-reasoned opinion of the Honorable Joseph Fernandes, we conclude Mother's issues merit no relief. The Family court opinion discusses and properly disposes of the questions presented. (***See*** Family Court Opinion, filed June 15, 2017, at 1-18) (finding: **(1-3)** Mother failed to complete her FSP objectives or remedy conditions which led to Child's dependency; Mother continues to deny all allegations of physical abuse of Child and his siblings and prostitution of Child's eldest sibling; Mother completed parenting and anger management classes without substantial progress; Child consistently refused visits with Mother because Child does not feel safe with her; Mother admits she has not visited with Child since September 2015; Mother failed to perform parental duties through her persistent refusal to take any responsibility for why Child and his siblings came into foster care or her failure to complete FSP

- 14 -

objectives, particularly regarding mental health treatment; Mother continues to be incapable of providing Child with essential parental care, control or subsistence necessary for Child's physical and mental wellbeing; conditions which led to Child's placement continue to exist, and Mother cannot remedy them within reasonable time; Child is currently in safe pre-adoptive home and wants to be adopted; Child fears returning to Mother's care; Child has strong bond with foster parents; Child's behavior in school has improved since his placement with foster family; Mother's parental bond with Child is attenuated; caseworker testified adoption is in Child's best interest, and Child would not suffer irreparable harm if Mother's parental rights were terminated; testimony from DHS' witnesses was credible; changing goal to adoption and terminating Mother's parental rights to Child under Section 2511(a)(1), (2), (5), (8), and (b) was proper). The record supports the court's decisions to change the family goal to adoption and terminate Mother's parental rights to Child. Accordingly, we affirm, based on the Family Court's opinion.

Order affirmed.

Judge Panella joins this memorandum

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/4/2017

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

PROPROTHY

In the Interest of M.S.D., a minor          :          CP-51-DP-0002138-2014
                                            .:          CP-51-AP-0000573-2016
                                            :
                                            :          51-FN-001971-2014
                                            :
APPEAL of: T.D., Mother                     :          1117 EDA 2017

**OPINION**

**Fernandes, J.:**

Appellant T.D. ("Mother") appeals from the order entered on March 2, 2017, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Mother's parental rights to M. S .D. ("Child") pursuant to the Adoption Act, 23 Pa. C. S. A. §2511(a)(1), (2), (5), (8), and (b).[1]  Yolanda Houston, Esquire, counsel for Mother, filed a timely Notice of Appeal with a Statement of Matter Complained of on Appeal pursuant to Rule 1925(b).

**Factual and Procedural Background:**

The family in this case became known to DHS on September 8, 2014, when DHS received a Child Protective Services ("CPS") report alleging that Mother and Child's father ("Father") were prostituting Child's eldest sibling ("Sibling 1") to an unidentified male; that Mother and Father were permitting the unidentified male to visit their home daily; that the most recent incident allegedly occurred on September 7, 2014; that Sibling 1 allegedly disclosed that she was sexually abused and was in pain; and that Sibling 1 was not present in school on September 8, 2014. The report further alleged that Sibling 1 was fearful of Mother and Father; and that Sibling 1 resided in a home with Child and other siblings. The report was indicated. That same day, DHS went to the home, at which point one of the siblings informed DHS through the window that Mother was unable to come to the door. DHS telephoned the Philadelphia Police Department ("PPD") who joined DHS outside of the home. Mother took thirty minutes to come to the door and initially refused to let DHS enter the home or speak to the children. Mother eventually agreed to allow

---

[1] The termination and goal change trial lasted three days. Due to the availability of the parties and court schedule, the trial started on October 12, 2016, and further testimony was taken on November 23, 2016, and finally on March 2, 2017.

DHS to speak with the children, but took another thirty minutes to bring them to the door. DHS met with Child's siblings; Mother informed DHS that Child was at an afterschool program. The children appeared fearful and guarded; however, there was no report of sexual abuse. Mother refused to permit DHS to complete a home assessment. Mother denied the allegations in the CPS report; refused to have Sibling 1 examined for signs of sexual abuse; and refused to allow the children to be interviewed by the Philadelphia's Children Alliance ("PCA"). Father was not at home; Mother informed DHS that he was at work. DHS also observed text messages allegedly from Sibling 1 stating that she was being sexually abused by Father's friend between noon and 2pm. Sibling 1's alleged text messages stated that Mother and Father were forcing her to have sex with an unidentified male. The messages were dated from September 5, 2014, to September 8, 2014. DHS also learned that Mother had contacted the school and had allegedly reported that Sibling 1 was ill and would not be in school that day. On September 9, 2014, DHS went to the children's respective schools and met with Sibling 1 and the other siblings; Child was not present at his school. Sibling 1 confirmed the allegations in the CPS report. DHS obtained Orders for Protective Custody ("OPC") for Sibling 1 and the other siblings, and placed them in a foster home through Presbyterian Children's Village. On September 10, 2014, DHS learned that Mother and Father had used inappropriate physical discipline on the children; that Mother and Father forced the children to kneel on uncooked rice for up to an hour at a time; and that Mother and Father forced the children to run up and down the stairs repeatedly for extended periods of time while not being allowed to drink or use the bathroom. Mother informed DHS that the maternal grandmother ("MGM") would bring Child to DHS; MGM appeared at DHS with Child. DHS obtained an OPC for Child and placed him with his siblings. On September 11, 2014, at the shelter care hearing, the OPC was lifted and temporary commitment to DHS was ordered to stand. The trial court ordered Mother and Father to cooperate with DHS and allow DHS to evaluate their home. On September 18, 2014, the trial court ordered no visits for Mother and Father. On September 22, 2014, DHS received a General Protective Services ("GPS") report alleging that Child's brother ("Sibling 2") stated that Child wanted to figure out if two boys could have sex and indicated that Child did that to him. Sibling 2 stated that this incident occurred two or three years prior, when he was four or five years old and it happened only once. The report was found to be valid. DHS conducted a home assessment of Mother and Father's home and found the home to be in deplorable condition. The home was infested with cockroaches and rodents; there were serious structural

damage and exposed wiring in the home; and there were no beds in the home. DHS determined that the home posed a health hazard. On September 29, 2014, Child was moved to his current foster home, due to allegations that Child had sexually inappropriate behavior with Sibling 2 while they were at parent's home. At the adjudicatory hearing on September 30, 2014, Child was adjudicated dependent along with his siblings and they were all committed to DHS custody. The trial court found that Child had been diagnosed with Attention Deficit Hyperactivity Disorder and was prescribed Concerta. The trial court ordered DHS to refer Mother and Father to the Achieving Reunification Center ("ARC") and that Mother and Father be referred to Behavioral Health Services ("BHS") for consultation and evaluation. The trial court granted Mother and Father supervised visits at the agency. On December 14 and 18, 2014, DHS received a CPS report and GPS report, respectively, alleging that Mother and Father had prostituted Sibling 1 for money and Father had been raping her since she was four years old; the children began to report physical abuse suffered while in the care of Mother and Father. The reports alleged that the children reported that Mother and Father beat them with belts, rods, metal brushes, or whatever was lying around; that they were beaten before school and when they returned home from school; that Child was beaten so badly once that his eyes bled; and that the children were trained to lie to school officials about any sustained injuries. The reports further alleged that Sibling 2 saw Father beat Child; that Sibling 2 saw Child just lying there; that Father told Sibling 2 to call an ambulance and all the children were instructed to say that Child fell and hurt himself; and that the children were very afraid of retaliation from Mother and Father for divulging the information related to the physical abuse. The CPS was indicated and the GPS was substantiated. At a December 22, 2014, permanency review hearing, the trial court ordered that visitation continue as arranged, and that Mother confirm visits with the agency twenty four hours in advance and that the agency confirm via email with Mother no later than the morning of the visits. The trial court took notice that Child attended individual therapy through the Village and received wrap-around, therapeutic support staff ("TSS"), and behavioral specialist consultant ("BSC") services in school. The trial court also ordered Mother and Father to sign consents for the necessary releases for Child to receive treatment. On January 9, 2015, DHS received a GPS report alleging that Mother was intimidating the children to not report anything further and had been trying to get the children to anger the foster mother so that the foster mother would hit them. The report was substantiated. At a September 3, 2015, permanency review, the trial court noted that Child was hospitalized at Horsham Partial

Program, and had been taken to the hospital for mental health once in July 2015 and twice in August 2015. The trial court ordered that if Mother and Father refuse to sign the necessary releases, DHS is permitted to sign for all routine medical treatments for Child.

DHS filed a petition to involuntarily terminate Mother's and Father's parental rights as to Child and change the permanency goal from reunification to adoption on June 22, 2016. (N.T. 10/12/16, pg. 7). The petition for termination of parental rights and goal change was heard on October 12, 2016, November 23, 2016, and March 2, 2017. Child had been in care for almost twenty-nine months at the time of the termination trial date.

The DHS sexual abuse investigator testified that the home had serious concerns at the time of Child's removal, such as cockroach and rodent infestations and exposed wiring. DHS also testified that Mother denied all allegations of the prostitution of Sibling 1 and the physical abuse of Child and his siblings. (N.T. 10/12/16, pgs. 22-45, 50-58).

All parties stipulated to the expertise of the Forensic Health Specialist ("Specialist") in the parenting capacity evaluation ("PCE") and psychosexual evaluation she conducted on Mother. The PCE was conducted in August 2015 and the psychosexual evaluation was conducted in July 2016. The Specialist testified that Mother understood the test and was consistent in her answers, but her responses indicated an intentional attempt to portray herself in a positive light. At times Mother denied that DHS was ever in her home, though she was very clear that there were no issues or concerns with the condition of the home. Mother reported that she did not learn anything from the parenting and anger management classes that she took. The Specialist recommended that Mother enter into mental health therapy to develop an understanding as to why Child and his siblings came into care and her role in it; and that Mother retake the parenting and anger management classes to gain some benefit. The Specialist also recommended that Mother submit to a polygraph. Mother insisted that DHS kidnapped and stole her children from her. The Specialist testified that, overall, Mother continues to deny all allegations regarding the concerns that brought Child and his siblings into care. Mother denied the prostitution of Sibling 1 and the physical abuse of Child and his siblings. The Specialist testified that Mother does not have the present ability to parent as she does not seem to have gained any benefit from therapy. (N.T. 10/12/16, pgs. 59-60, 65, 67-72, 74-75, 78-80, 93-94, 109-110).

The CUA caseworker that handled the case from December 2015 to August 2016 testified that Mother's SCP objectives were to attend weekly psychotherapy; to monitor academic and attendance goals for Child; to attend anger management and parenting classes; and to attend weekly supervised visits at DHS. Mother's SCP objectives were consistently the same throughout the case. Mother enrolled at the Consortium for psychotherapy, but never provided CUA with any documentation other than attendance slips. CUA testified that Child only attended a few visits towards the beginning of CUA's assignment of the case. Child stopped attending and indicated to CUA that he did not want visits with Mother because he did not feel safe around her. Child was consistent in refusing visits with Mother each week. The CUA caseworker testified that Mother continued to deny the allegations that brought Child and his siblings into care and accuse DHS of kidnapping her children. Child receives wraparound services in school and mobile therapy at home. Mother focused more on what happened at the beginning of the case, rather than on what was continuously going on with Child. Child enjoys being in the care of his current foster parent and is willing to be adopted by her. Child reported that he is afraid to go home. The CUA caseworker testified that reunification with Mother was ruled out because her PCE indicated that Mother was unable to provide permanency and safety for Child's well-being, and Child did not wish to be returned to Mother. Mother categorically denied the sexual abuse allegations, physical abuse allegations, and the housing issues that brought Child and his siblings into care. The CUA caseworker also testified that Child would not suffer irreparable harm if Mother's rights were terminated. (N.T. 10/12/16, pgs. 121-128, 130-133, 138-141, 144).

The current CUA case manager, who took over the case in September 2016, testified that Mother was moderately compliant with her SCP objectives. Mother completed an intake at the Consortium in April 2016 and has been attending ongoing bi-weekly outpatient therapy. Mother signed releases for her attendance record and evaluation only. CUA informed Mother that she needed a release for the content of Mother's therapy at the Consortium to gauge her compliance, but Mother refused, claiming she wanted to consult with her attorney. As of the date of the termination trial, Mother had not provided a release for the treatment plan of her therapy to CUA. Mother refused to participate in the polygraph, as recommended by the Specialist. The CUA case manager testified that Mother continued to deny that any physical discipline occurred in the home and to accuse DHS of kidnapping her children. Mother also refused to acknowledge that there were ever any issues with the condition of the home or Child's inappropriately sexualized behavior. The

CUA case manager testified that the issues in the home have been resolved, and the home is appropriate, but there are still no beds in the home. Mother reported that Father moved out of the home in December 2014, a few months after Child and his siblings were removed. CUA testified that Mother completed all of her SCP objectives, except for the polygraph. However, Mother still does not take responsibility for why Child and his siblings came into care. Since the CUA case manager received the case, Child has not requested any visits with Mother. Child reported that he is especially afraid of Father and does not feel that Mother can protect him. The CUA case manager testified that Mother and Child do not have a parent-child relationship. Child would not suffer any irreparable harm if Mother's parental rights were terminated. The foster parent meets all of Child's needs. Adoption is in Child's best interests. After the CUA case manager was excused in the middle of the trial, Mother's attorney requested to add nine additional witnesses to her case-in-chief; the trial court denied her request. (N.T. 11/23/16, pgs. 8-17, 21-22, 27-29, 32, 34-37, 40-45).

Mother testified that she understands why Child and his siblings were taken out of the home, but only acknowledged allegations of physical abuse against Sibling 1. Mother claimed that her home was under renovations when Child and his siblings were removed and denied that there were any cockroach issues. Mother denied the allegations of prostituting Sibling 1 and that there was ever inappropriate physical discipline in the home. Mother completed parenting classes twice and claimed that she benefited from them, but spoke more about fire safety and proper nutrition than behavior modification without physical discipline. Mother's second class of anger management is still outstanding. Mother claimed to be working on her PCE and psychosexual evaluation goals. Mother admitted to refusing the polygraph, claiming that the results would be manipulated against her. Mother admitted that she has been through four therapists at the Consortium and testified that she has spent the most time working on coping skills and strategies to get Child and his siblings back in her care. Mother claimed to have signed a release for the CUA case worker as to the content of her therapy in August 2016, around the time that the case was transferred. Mother admitted that her previously close relationship to Child has been destroyed or, at the very least, damaged. Mother again denied any inappropriate sexual behavior from Child and claimed that Child was removed from his siblings' foster home because he needed therapy. Mother has not visited with Child since September 2015, a year and a half ago. Mother only sees Child at his doctor's appointments. Mother denies that Child does not want to see her and claims CUA has

not allowed her to see Child for all this time. Mother claims she completed all of her SCP objectives and has gained a deeper understanding of what it means to be a parent. (N.T. 3/2/17, pgs. 47-55, 57-60, 65-71, 73-76). Following testimony, the trial court terminated Mother's and Father's parental rights to Child under §2511(a)(1), (2), (5), (8), and (b).[2]

**Discussion:**

Mother avers that the Trial Court erred:

1. When it found that [DHS] by clear and convincing evidence has met its burden to terminate Appellants Parental Rights under 23 PA. C.S.A. §2511(a)(1), §2511(a)(2), §2511(a)(5), and §2511(a)(8).
2. When it found that the termination of Mother's parental rights was in the Child's best interest and that [DHS] has met its burden of [proof] pursuant to 23 PA. C.S.A. §2511(b).
3. In changing the permanent placement goal from reunification to adoption.

Mother has appealed the involuntary termination of her parental rights. The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa. C. S. A. §2511(a), which provides the following grounds for §2511(a)(1):

(a) **General rule** – The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntary terminate parental rights, the burden of proof is on the party seeking termination which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month

---

[2] The trial court terminated parental rights to Child of both Mother and Father, but only Mother appealed.

period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In re C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997).

The petition for involuntary termination of parental rights and termination were filed on June 22, 2016. For the six month period prior to filing, Mother did not successfully complete her SCP objectives. The DHS sexual abuse investigator testified that Mother's home created a serious health risk for Child as there were cockroach and rodent infestations and exposed wiring through holes in the walls. Mother testified that the home was under renovations when Child and his siblings were removed from the home. The CUA case manager testified that the home is now appropriate, but there were no beds in the home at the time of the home assessment. The CUA case manager and case worker both testified that Mother refuses to acknowledge that any repairs to the home were needed in the first place and denies that there was ever a cockroach problem. Concerns about Mother's ability to keep the house clean and free of repairs remain. (N.T. 10/12/16, pgs. 31-36, 144; N.T. 11/23/16, pgs. 29, 36; N.T. 3/2/17, pgs. 47-48). Mother enrolled at the Consortium for psychotherapy, but never gave CUA access to the content of her therapy sessions. Mother claimed she signed the release for the CUA case worker, though only days before he transferred the case to the CUA case manager. Mother testified that she has been working on coping skills and strategies on how to get Child back into her care during therapy sessions. Mother admitted that since starting therapy in October 2015, she has been through four different therapists, which indicates inconsistency in her therapy. The Specialist testified that Mother did not seem to be taking much away from therapy as she consistently continues to deny all allegations of physical abuse of Child and his siblings, the prostitution of Sibling 1, and that there was ever anything wrong with the conditions with the home. After the evaluations, the Specialist recommended that Mother take a polygraph test, but Mother continuously refused. (N.T. 10/12/16, pgs. 29-36, 69-75, 78-80, 94, 124-125, 129-130; N.T. 11/23/16, pgs. 8-14; N.T. 3/2/17, pgs. 47-48, 52-55, 57-59; 65-68, 70-76). The CUA case worker testified that Mother completed her parenting and anger management classes. However, the Specialist testified that Mother did not seem to gain any insight into being a better parent or controlling her anger from those classes and recommended that she retake them. Mother completed a second set of parent classes and claimed that she gained a benefit

from them, but testified to learning more about fire safety and proper nutrition for Child rather than behavior modification. (N.T. 10/12/16, pgs. 70-72, 126-127; N.T. 3/2/17, pgs. 49-52). The CUA case worker testified that Child started refusing visits with Mother early in the case because he did not feel safe around her. Child was consistent in his weekly refusal of visits with Mother. Since the CUA case manager took over the case in September 2016, Child has not requested visits with Mother. Child reported to the CUA case manager that he is especially afraid of Father and does not feel that Mother can protect him. Mother admitted that she has not visited with Child since September 2015, over a year and a half ago. Mother has only seen Child at doctor's appointments. Mother denied that Child refused to see her and instead blamed CUA for not allowing her to see Child. (N.T. 10/12/16, pgs. 127-128, 130-133; N.T. 11/23/16, pgs. 15-17, 27-28, 34; N.T. 3/2/17, pgs. 68-71). Over the six months prior to the filing of the termination petitions, Mother failed to perform her parental duties by her constant failure to take responsibility for why Child and his siblings came into care and to successfully complete her SCP objectives, especially her treatment plan for her mental health therapy. Mother refused to sign releases to disclose her mental health treatment plan. Mother's inability to perform those parental duties is not limited to the six month period, but extends throughout the life of the case. Child has been in care for twenty-nine months. Child needs permanency. Mother has an affirmative duty to place herself in a parenting position. Mother evidenced a settled purpose of relinquishing parental claims to Child by failing and refusing to perform her parental duties. Since these facts were demonstrated by clear and convincing evidence, the trial court did not err or abuse its discretion in terminating Mother's parental rights under this section.

The trial court terminated Mother's parental rights under 23 Pa. C. S. A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect, or refusal of the parent that causes the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996).

Child was taken into DHS custody because Mother was unable to provide essential parental care: Sibling 1 reported being prostituted by Mother and Father; Child and his siblings reported physical abuse from Mother; and Mother's home was a health risk to Child and his siblings. Mother was unable to remedy the causes of her repeated and continued incapacity to provide Child with essential parental care, control, or subsistence necessary for Child's physical and mental well-being. Mother did not successfully complete her SCP objectives. At the time of removal, the home was infested with cockroaches and rodents and had exposed wiring through holes in the walls. Mother testified that the home was under renovations at the time of removal and denied the presence of cockroaches. The Specialist testified that Mother wavered between denying and admitting that DHS was ever in the home. The CUA case manager testified that the home is now appropriate, but lacked beds at the time of the home assessment. Mother testified that there is now a bed in the home for Child. Mother also testified that Father moved out of the home a few months after Child's removal. (N.T. 10/12/16, pgs. 31-36, 144; N.T. 11/23/16, pgs. 29, 36; N.T. 3/2/17, pgs. 47-48). Mother is currently still attending the Consortium for psychotherapy, meaning she has not yet completed that objective. Mother did not provide any documentation regarding the content of her therapy to CUA at any point during the case. Mother refuses to sign releases for her mental health treatment plan. The Specialist and CUA all testified that Mother continuously denied all of the allegations of Siblings 1's prostitution, the physical abuse of Child and his siblings, and the home having any issues. The Specialist also recommended that Mother submit to a polygraph test, which she continuously refused to take. The Specialist also testified that Mother did not seem to be gaining any benefit from the therapy sessions. Mother still has not accepted the concerns that caused Child's coming into care and her role in it. (N.T. 10/12/16, pgs. 29-36, 69-75, 78-80, 94, 124-125, 129-130; N.T. 11/23/16, pgs. 8-14; N.T. 3/2/17, pgs. 47-48, 52-55, 57-59; 65-68, 70-76). Mother completed anger management and twice completed parenting classes after the Specialist reported that Mother had not gained any benefit from the classes and should retake them. Mother testified that she learned fire safety and proper nutrition for Child from the parenting classes. However, Mother has not provided any details as to what she learned to modify her behavior or disciplinary techniques to parent her Child. (N.T. 10/12/16, pgs. 70-72, 126-127; N.T. 3/2/17, pgs. 49-52). The CUA case worker testified that Child began refusing visits with Mother as soon as he came into care. Child reported to CUA that he did not feel safe around Mother and did not feel that she could protect him. Child has not requested visits since September

2015, when Mother last visited with Child. Mother only sees Child at his doctor's appointments. Mother denies that Child refuses to visit with her and blames CUA for not allowing her to see Child. (N.T. 10/12/16, pgs. 127-128, 130-133; N.T. 11/23/16, pgs. 15-17, 27-28, 34; N.T. 3/2/17, pgs. 68-71). Mother has failed to take affirmative steps to place herself in a position to parent Child. Child needs permanency, which Mother cannot provide. Mother is unable to take immediate custody of Child and ensure his needs and safety. Child is fearful of Mother. Mother continues to show an inability to safely protect Child. Mother is still unable to comprehend why Child was removed from her home. Mother still refuses to disclose her mental health treatment plan. Mother is unable to remedy the conditions and causes of the incapacity, abuse, or neglect for Child's physical and mental well-being. Therefore, DHS met its burden under §2511(a)(2) of the Adoption Act and termination under this section was also proper.

Mother also appeals the trial court's termination of parental rights under 23 Pa. C. S. A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond a period of time deemed reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 508 (Pa. Super. 2004).

Child in this case has been in DHS custody since September 2014, twenty-nine months by the end of the termination trial. Child was placed in care because Mother was unable to parent. Mother's chief obstacles to reunification was her failure to understand why Child and his siblings came into care in the first place and her role in their placement, her denial of all the allegations, her failure

to grant CUA a release or disclose the treatment plan of her psychotherapy, and her failure to successfully complete all of her SCP objectives. Mother was aware of her objectives. (N.T. 10/12/16, pgs. 36-39, 121-124). Mother did complete her initial classes of anger management and parenting. The Specialist testified that Mother did not seem to gaining any benefit from the classes at the time of Mother's evaluations. Mother took parenting classes for a second time after the evaluations. Mother testified that she did learn about parenting from the classes and went into detail about fire safety and proper nutrition for Child, but did not elaborate upon any behavioral modification and disciplinary techniques that she claims to have learned. (N.T. 10/12/16, pgs. 70-72, 126-127; N.T. 3/2/17, pgs. 49-52). Mother still has not provided documentation of completing her second anger management class. Mother's home, which at the time of Child's removal was infested with cockroaches and had exposed wiring and holes in the walls, is now appropriate. At the time of inspection, however, Mother did not have any beds in the home, though she claims to have them now. CUA and the Specialist testified that Mother refuses to acknowledge that there were any issues with the house to begin with. Concerns about Mother's ability to keep the house clean and free of repairs remain. (N.T. 10/12/16, pgs. 31-36, 144; N.T. 11/23/16, pgs. 29, 36; N.T. 3/2/17, pgs. 47-48). Mother is enrolled at the Consortium for psychotherapy, but has not provided CUA with a release as to the treatment plan of her therapy. Throughout the case, Mother refused to acknowledge any of the allegations that brought Child and his siblings into care and continues to deny all of them, including that there were any issues with the home. The Specialist testified that, from Mother's evaluations, Mother does not seem to be gaining any benefit or insight from her therapy. Mother continuously blames DHS and CUA for stealing her children from her. The Specialist recommended that Mother submit to a polygraph test, but Mother refused to take it, claiming that the results would be altered against her favor. Mother's blaming of CUA and denial of her role in Child's coming into care indicates that she has not successfully completed her therapeutic program. Mother has been through four different therapists at the Consortium, which indicates that Mother's therapy has been inconsistent. (N.T. 10/12/16, pgs. 29-36, 69-75, 78-80, 94, 124-125, 129-130; N.T. 11/23/16, pgs. 8-14; N.T. 3/2/17, pgs. 47-48, 52-55, 57-59; 65-68, 70-76). Mother has not visited with Child since September 2015. Child consistently refuses to visit with Mother, reporting to CUA that he does not feel safe around Mother and does not feel that she could protect him. Child has consistently refused to see Mother every week. Mother testified that she still sees Child at his doctor's appointments. Mother claimed the CUA has prevented her from

seeing Child and denies that Child refuses to visit with her. (N.T. 10/12/16, pgs. 127-128, 130-133; N.T. 11/23/16, pgs. 15-17, 27-28, 34; N.T. 3/2/17, pgs. 68-71). Child is in the care of a foster parent who takes care of all of his needs. The trial court always found that DHS made reasonable efforts to reunify Child with Mother. The trial court also found that Mother was unable to remedy the conditions which led to Child's placement within a reasonable amount of time as evidenced by Mother's failure to successfully complete her SCP objectives. Child is currently placed in a safe, permanent, and pre-adoptive home. The trial court heard testimony that adoption is in Child's best interests and he would not suffer any irreparable harm if Mother's parental rights were terminated. (N.T. 10/12/16, pgs. 138-141, 144; N.T. 11/23/16, pgs. 21-22). Child wants to be adopted and is fearful of returning to Mother. Mother was given ample time to place herself in a position to parent Child. Child cannot wait for Mother to decide when to be a parent. The conditions which led to the placement of Child continue to exist, and Mother cannot and will not remedy them within a reasonable amount of time. As a result, the trial court found that termination of Mother's parental rights would in the best interests of Child's physical, intellectual, moral, and emotional well-being. The trial court made this determination on the basis of clear and convincing evidence, so termination under this section was proper.

The trial court also terminated Mother's parental rights under 23 Pa. C. S. A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love and comfort, security and stability. *In re Bowman*, A.2d 217 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Child has been in care for at least twenty-nine months and needs permanency. Child is currently placed with a foster parent who provides for all of Child's needs. (pgs. 10/12/16, pgs. 138-141, 144). Mother has not successfully completed her SCP objectives and has not placed herself in a position to parent Child. Mother's outstanding objective was mental health therapy to gain insight into the reasons for and her role in why Child and his siblings came into care. Mother was aware of her objectives, which were consistent throughout the life of the case. (N.T. 10/12/16, pgs. 39, 121-124). CUA testified that Mother made repairs to the home, which at the time of Child's removal was infested with cockroaches and had exposed wiring with holes in the wall. The home is now appropriate, though there were no beds in the home at the time of the home inspection. Mother testified that there are now beds in the home. CUA and the Specialist testified that Mother refused to acknowledge that there were any issues with the home in the first place. Mother testified that the home was under renovations at the time of Child's removal and that there were never any cockroaches. (N.T. 10/12/16, pgs. 31-36, 144; N.T. 11/23/16, pgs. 29, 36; N.T. 3/2/17, pgs. 47-48). Mother is enrolled at the Consortium for psychotherapy, but has not provided CUA with a release as to the treatment plan of her therapy. CUA and the Specialist testified that Mother refuses to accept any responsibility for Child and his siblings coming into care and denies all of the allegations of Siblings 1's prostitution, physical abuse of Child and his siblings, and that the home had any issues to begin with. Mother blames DHS and CUA for kidnapping her children from her. Mother also denies that Child exhibited any inappropriate sexual behavior; Mother claims that Child was removed from his siblings' foster home because he needed therapy. The Specialist recommended that Mother submit to a polygraph after she completed the PCE and psychosexual evaluations. Mother refused to take the polygraph, claiming that the results would be altered against her favor. Mother has been through four therapists since starting therapy, meaning that her therapy has been somewhat inconsistent. (N.T. 10/12/16, pgs. 29-36, 69-75, 78-80, 94, 124-125, 129-130; N.T. 11/23/16, pgs. 8-14; N.T. 3/2/17, pgs. 47-48, 52-55, 57-59; 65-68, 70-76). Mother completed her anger management and parenting classes. The Specialist testified that Mother did not seem to gain any benefit from the programs and recommended that she retake them. Mother testified that she retook the parenting class and learned how to be a better parent. Mother detailed fire safety and proper nutrition for Child, but said little as to the behavioral modification and disciplinary techniques she claimed to have learned. (N.T. 10/12/16, pgs. 70-72, 126-127; N.T. 3/2/17, pgs. 49-52). Mother's second anger management class is still outstanding. Mother is still

unable to comprehend why Child was removed from her home. Mother is unable to safely parent and protect Child. CUA testified that Child consistently refuses to visit with Mother. Child reported to CUA that he did not feel safe around Mother and that he did not feel that she could protect him. Mother has not visited with Child since September 2015, though she attends his doctor's appointments. Mother denies that Child refuses to see her and blames CUA for not allowing her to visit with Child. (N.T. 10/12/16, pgs. 127-128, 130-133; N.T. 11/23/16, pgs. 15-17, 27-28, 34; N.T. 3/2/17, pgs. 68-71). The trial court heard testimony that adoption is in Child's best interests. (N.T. 10/12/16, pgs. 138-141, 144; N.T. 11/23/16, pgs. 21-22). Child is fearful of Mother and wants to be adopted. The conditions that led to Child's placement into care continue to exist as Mother failed to successfully complete her SCP objectives. The testimony of the DHS witnesses were credible. Mother is not ready or able to parent Child, take custody of Child, and ensure his needs. As the record contains clear and convincing evidence that termination was in the best interests of the Children, the trial court did not abuse is discretion and termination under this section was also proper.

After a finding of any grounds for termination under section (a), the court must, under 23 Pa. C. S. A. §2511(b), also consider what – if any – bond exists between parent and child. *In re Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *Id.* At 762-763. However under 23 Pa. C. S. A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

Mother has not visited with Child since September 2015, over a year and a half ago. Child consistently refuses to visit with Mother. Child does not feel safe around Mother, even reporting to CUA that he is afraid to go home and does not believe that Mother can protect him. Child is

fearful of returning to Mother's home. Mother only sees Child at his doctor's appointments. CUA testified that Mother does not have a parental relationship with Child. Mother testified that she had a strong bond with Child and admitted that her bond with Child has been destroyed, or at least heavily damaged, by his placement in care. Mother's parental bond with Child is attenuated. Child has a strong bond with his foster parent and wishes to be adopted by her. Upon entering care, Child had behavioral issues in school which caused his wraparound services to be temporarily stopped for a period of time. Child has been doing much better in the foster parent's care. The foster parent takes care of all of Child's needs. CUA testified that adoption is in Child's best interests and that Child would not suffer irreparable harm if Mother's parental rights were terminated. Child is in a safe, permanent, and pre-adoptive home. (N.T. 10/12/16, pgs. 127-133, 138-141, 144; N.T. 11/23/16, pgs. 13-17, 21-22, 27-29, 32, 34-37; N.T. 3/2/17, pgs. 68-71). The DHS witnesses were credible. Consequently, the trial court did not abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

Mother also alleges that the court erred in changing Child's permanency goal from reunification to adoption. In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest of R.P. a Minor*, 957 A.2d 1205 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply instructions received. *In re R.T.*, 778 A.2d 670 (Pa. Super. 2001). The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Mother is not ready or able to parent Child. At the time of the termination trial, Mother had not successfully completed her SCP objectives. Mother denied that there were any issues in the home to begin with and instead testified that the home was under renovations when Child was removed from the home. The home is now appropriate, but there were no beds in the home at the time of the home assessment. Mother claims that Father moved out of the home shortly after Child was

removed, but CUA testified Father appeared to still be living there. (N.T. 10/12/16, pgs. 31-36, 144; N.T. 11/23/16, pgs. 29, 36; N.T. 3/2/17, pgs. 47-48). Mother still attends psychotherapy at the Consortium and has not granted CUA access to her treatment plan or progress notes. Mother continues to deny all of the allegations of abuse, child prostitution, and concerns about the home which brought Child and his siblings into care. The Specialist testified that, based on her evaluations, Mother is not gaining any benefit from her therapy sessions as she also continues to blame DHS and CUA for kidnapping and stealing her children. After the evaluations were completed, the Specialist recommended that Mother submit to a polygraph test. Mother refused to take it, claiming that the results would be altered against her. Mother's therapy has also been inconsistent, as she has been through four different therapists in under a two-year period. (N.T. 10/12/16, pgs. 29-36, 69-75, 78-80, 94, 124-125, 129-130; N.T. 11/23/16, pgs. 8-14; N.T. 3/2/17, pgs. 47-48, 52-55, 57-59; 65-68, 70-76). Mother completed parenting and anger management classes. The Specialist testified that Mother did not seem to have gained any benefit from the programs and recommended that Mother retake them. Mother testified that she completed a second set of parenting classes. The second anger management class is still outstanding. Mother described learning fire safety and proper nutrition for the Child, but did not give any specifics as to the behavioral modification and disciplinary techniques she claimed to have learned. (N.T. 10/12/16, pgs. 70-72, 126-127; N.T. 3/2/17, pgs. 49-52). Mother has not visited with Child in over a year and a half. Child consistently refuses to visit with Mother. Child does not feel safe around Mother and does not believe that she can protect him. Child is fearful of returning to Mother's home. Mother only sees Child at his doctor's appointments. Mother blames CUA for keeping her from visiting with Child and denies that Child refuses to visit with her. (N.T. 10/12/16, pgs. 127-128, 130-133; N.T. 11/23/16, pgs. 15-17, 27-28, 34; N.T. 3/2/17, pgs. 68-71). Child's behavioral issues at school have stabilized due to the foster parent's efforts. Child is in a safe, permanent, and pre-adoptive home. The trial court heard testimony that adoption is in Child's best interests. (N.T. 10/12/16, pgs. 138-141, 144; N.T. 11/23/16, pgs. 21-22). Child needs permanency, which Mother cannot provide. Mother is still unable to understand why Child came into care and what role she played in him being removed from her home. The DHS witnesses were credible. The record established by clear and convincing evidence that the change of permanency goal from reunification to adoption was proper. The trial court did not err or abuse its discretion when it changed the goal to adoption.

**Conclusion:**

For the aforementioned reasons, the court properly found that DHS met its statutory burden by clear and convincing evidence regarding termination of Mother's parental rights pursuant to 23 Pa. C. S. A. §2511 (a)(1), (2), (5), (8) and (b) since it would best serve Child's emotional needs and welfare. The court also properly found that changing the Child's permanency goal from reunification to adoption was in Child's best interest. The trial court's termination of Mother's parental rights and change of goal to adoption were proper and should be affirmed.

By the court,

_____

Joseph Fernandes, J.

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of M.S.D., a minor | : | CP-51-DP-0002138-2014 |
| | : | CP-51-AP-0000573-2016 |
| | : | |
| | : | 51-FN-001971-2014 |
| | : | |
| APPEAL of: T.D., Mother | : | 1117 EDA 2017 |

## Proof of Service

I hereby certify that this court is serving today, June 15, 2017, the enclosed Opinion upon the following persons:

Courtney Norella, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, PA 19102
Attorney for DHS

Sarah Parker, Esq.
Defender's Association
1441 Sansom Street
Philadelphia, PA 19102
Attorney for Appellee/Child, M.S.D.

Yalonda Houston, Esq.
208 W. Front Street
Media, PA 19063
Attorney for Appellant/Mother, T.D.

Michael Nix, Esq.
123 S. Broad Street, Suite 182
Philadelphia, PA 19109
Attorney for Father

By: _____
Vijaya P. Singh
Law Clerk to the Hon. Joseph Fernandes
Philadelphia Family Court
1501 Arch Street, Suite 1431
Philadelphia, PA 19102
Telephone: (215) 686-2660